**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

RAGHEED AKRAWI,

                Petitioner,

v.                                  Case No. 05-CV-74518-DT

RAYMOND BOOKER,

                Respondent.

_____/

### OPINION AND ORDER DENYING HABEAS CORPUS PETITION

Petitioner Ragheed Akrawi has filed an application for the writ of habeas corpus under 28 U.S.C. § 2254.  The habeas petition challenges Petitioner's 1991 state court conviction for conspiring to commit a narcotics offense.  The court has found no merit in Petitioner's grounds for relief. Therefore, the habeas petition will be denied.

### I.  PROCEDURAL BACKGROUND

Petitioner was tried jointly with Issam Hermiz in Oakland County Circuit Court.[1] On October 22, 1991, he was convicted, as charged, of conspiracy to possess with intent to deliver over 650 grams of cocaine, Mich. Comp. Laws § 750.157a.  On November 5, 1991, the trial court sentenced Petitioner to life imprisonment for the offense.[2]

Petitioner raised two of his three habeas claims in an appeal of right.  The

---

[1] The evidence against the two defendants did not overlap.  The prosecutor at the joint trial stated during his closing argument that it was unfortunate the two defendants were tried together because the two cases did not logically go together.

[2] Due to an amendment in state law, Petitioner's sentence subsequently was reduced to a minimum of seventeen and a half years in prison.

Michigan Court of Appeals affirmed his conviction.  *See People v. Akrawi*, No. 147344

(Mich. Ct. App. Oct. 24, 1995).  On November 22, 1996, the Michigan Supreme Court

denied leave to appeal, *see People v. Akrawi*, No. 104862 (Mich. Sup. Ct. Nov. 22,

1996), and on February 28, 1997, the Michigan Supreme Court denied Petitioner's

motion for rehearing.

On November 24, 1997, Petitioner filed a federal habeas corpus petition, which

contained at least one unexhausted claim.  The court dismissed the petition without

prejudice so that Petitioner could pursue state remedies for his unexhausted claims.

*See Akrawi v. Burke*, No. 97-CV-10417-BC (E.D. Mich. Sept. 15, 1998).

Petitioner then filed a motion for relief from judgment in the trial court.  The

motion alleged that the prosecutor withheld favorable evidence of a plea arrangement

between Wissam Abood and the prosecution in exchange for Abood's testimony against

Petitioner.  The trial court held an evidentiary hearing in July of 2001, and on May 30,

2002, the trial court granted Petitioner's motion and ordered a new trial.  The prosecutor

appealed the trial court's decision.  The trial court then stayed the proceedings and set

a cash bond in the amount of $12,000,000.[3]  The Michigan Court of Appeals reversed

the trial court's grant of a new trial, *see People v. Akrawi*, No. 241925 (Mich. Ct. App.

Dec. 9, 2003), and, on December 29, 2004, the Michigan Supreme Court denied

Petitioner's application for leave to appeal.  *See People v. Akrawi*, 471 Mich. 944; 690

---

[3] Petitioner filed a second habeas petition, which challenged the trial court's decision to set pretrial bond at $12,000,000.  United States District Judge Nancy G. Edmunds dismissed the petition because Petitioner's request for pretrial bail ultimately became moot.  *See Akrawi v. Jackson*, No. 03-CV-74132-DT (E.D. Mich. Dec. 2, 2004).

N.W.2d 104 (2004) (table).[4]

Petitioner filed the pending habeas corpus petition through counsel on November 29, 2005. The grounds for relief read:

I.      Petitioner was denied his constitutional right to a fair trial when the prosecution and a crucial witness not only failed to disclose, but arbitrarily and deliberately acted in concert to conceal the fact that the witness was accorded a substantial deal in exchange for his highly suspect testimony.

II.     Petitioner was denied his constitutional right to due process of law where:

     A.    the prosecutor improperly bolstered key prosecution witnesses by placing the authority of law enforcement and the prosecutor's office behind the witnesses and placing the court's imprimatur on the accusations by arguing that witness deals are "approved by federal judges;"

     B.    the trial court admitted, over objection, threats Petitioner allegedly made to police during a warrantless, illegal search unrelated to the charges;

     C.    the trial court abdicated its responsibility to control the proceedings when it allowed the attorneys to debate in the jurors' presence the applicability of the verdict and the issue of forfeiture of Mr. Akrawi's property without ruling on the matter or issuing an appropriate instruction to the jurors, and;

     D.    the prosecutor was permitted over objection, to introduce evidence of large sums of money and material possessions which was irrelevant to the charges.

III.    Mr. Akrawi was denied his right of confrontation where the

---

[4] Justice Stephen J. Markman did not participate in the decision.

prosecution produced, over objection, testimony that the instant charge developed from anonymous accusers who were not produced as witnesses at trial.

## II. THE STATUTE OF LIMITATIONS

Respondent argues that the habeas petition is barred from review by Petitioner's failure to comply with the one-year statute of limitations. *See* 28 U.S.C. § 2244(d). Petitioner's first habeas petition was timely filed, and the parties stipulated to dismiss that petition without prejudice. Furthermore, Petitioner's claims lack merit, and the statute of limitations is not a jurisdictional defense. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). The court therefore will proceed to address the substantive merits of Petitioner's claims rather than analyze whether Petitioner complied with the statute of limitations.

## III. STANDARD OF REVIEW

Habeas petitioners are entitled to the writ of habeas corpus only if they can show that the state court's adjudication of their claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362,

4

412-13 (2000) (Justice O'Connor's majority opinion on Part II). A state court's decision

is an "unreasonable application of" clearly established federal law "if the state court

identifies the correct governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect*

application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court

making the 'unreasonable application' inquiry should ask whether the state court's

application of clearly established federal law was objectively unreasonable." *Id.* at 409.

> The state-court decision need not refer to relevant Supreme Court cases
> or even demonstrate an awareness of them. *Early v. Packer*, 537 U.S. 3,
> 8 (2002) (per curiam). Instead, it is sufficient that the result and reasoning
> are consistent with Supreme Court precedent. *Id.* A state court moreover
> does not act contrary to clearly established law when the precedent of the
> Supreme Court is ambiguous or nonexistent; it may hold a view that is
> different from [the Sixth Circuit Court of Appeals] or another federal court.
> *See Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam). Ultimately,
> AEDPA's highly deferential standard requires that this court give the state-
> court decision "the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S.
> 19, 24 (2002) (per curiam).

*Slagle v. Bagley*, 457 F.3d 501, 513-14 (6th Cir. 2006), *cert. denied*, __ S. Ct. __, 2007

WL 1172856 (U.S. June 18, 2007) (No. 06-0659).

> Furthermore, state findings of fact are presumed to be correct unless the
> defendant can rebut the presumption by clear and convincing evidence.
> 28 U.S.C. § 2254(e)(1). Finally, review is conducted in light of the law as
> it existed at the time of the final state court decision, *Teague v. Lane,* 489
> U.S. 288 (1989), unless an intervening constitutional decision announces
> a "watershed" rule of criminal law with implications for the fundamental
> fairness of the trial proceeding. *Caspari v. Bohlen,* 510 U.S. 383, 396 (1994).

*Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005).

## IV. FACTUAL BACKGROUND

### A. The Prosecution Witnesses

Rene Arias testified that, when he came to Detroit, he began to sell drugs and deal in cocaine. He started doing business with the Jimenez brothers. He would drive a car full of cocaine from Florida to Michigan and transport money back to Florida. He delivered cocaine to Petitioner only one time, but Petitioner was present on nine or ten other occasions when Arias delivered cocaine to two other men. Arias started dealing with all three men in 1987. At one point in time, Petitioner owed hundreds of thousands of dollars for cocaine.

Arias was arrested on June 28, 1988, when the police discovered 99 kilos of cocaine in his truck. He testified at trial that it had been his intent to sell the cocaine to Petitioner little by little, because Petitioner owed money for past purchases of cocaine.

Timothy Bethel testified that he was a special agent with the United States Customs Service. He explained that Rene Arias cooperated with law enforcement officials after his arrest and that Arias identified Petitioner in a photographic array as someone he knew.

Floyd Black was a sales manager for European Motors in Ferndale, Michigan. He testified about five expensive cars that Petitioner purchased and registered in other peoples' names.

Howard Hayes was a special agent for the Drug Enforcement Agency (DEA). On November 4, 1988, an informant introduced him to Petitioner, and he pretended to be a drug dealer. He handed $5,000 to Petitioner to pay off the informant's debt for a previous cocaine deal. When he asked Petitioner about the possibility of buying five ounces of cocaine in the future, Petitioner declined to make a deal with Hayes. Petitioner said that he was kind of "hot." In other words, the police were watching him.

6

Petitioner offered to make arrangements for someone else to handle the deal.

DEA agent Louis Palombella testified that Petitioner was under surveillance during the investigation and that he never observed Petitioner going to a job. Palombella claimed that several cars connected to Petitioner were seized and that Petitioner wore gold and diamond jewelry.

On March 1, 1989, Palombella participated in a raid on a Bloomfield Township residence owned by Petitioner's aunt. Petitioner was handcuffed and detained during a protective sweep of the house. Petitioner stated to the officers that the next time they came through the door, he would have a 223 (a high velocity .22 caliber bullet typically used in an M-16 or AR 15 rifle) waiting for them and that it would penetrate both sides of their vests. In an upstairs bedroom of the house, agents found proof of residency for Petitioner, as well as a bulletproof vest, a book on explosives, and a 30-round magazine for an AR-15 with at least one bullet in it.

Wissam Abood[5] testified that he purchased cocaine from Petitioner during the summer of 1988. On two occasions, Abood purchased a quarter kilo of cocaine from Petitioner, and on another occasion he purchased an ounce of cocaine from Petitioner. On a fourth occasion, he agreed to pay Petitioner $1,200 for two ounces.

Abood was arrested in Macomb County for a drug delivery involving over 650 grams of cocaine. He testified that he did not make a deal with the Macomb County Prosecutor's Office and was not promised anything in return for his testimony against

---

[5] This name appears in the state court record as "Abood" and as "Abbod." The court has adopted the former spelling, which the parties and the state court used.

Petitioner in Oakland County.

Sergeant Charles Pappas, a police officer in Oakland County, Michigan, came into contact with Wissam Abood while working on an investigative task force. He explained to the jury that Abood was released on bond so that Abood could work for law enforcement officials and assist with Petitioner's case. Pappas testified that Abood was not promised anything, but that he (Pappas) would provide full details of Abood's cooperation if asked by Macomb County officials about Abood's cooperation. Pappas denied seeking a reduction in the charge against Abood, and he denied making a deal with Abood. He also said that the Macomb County Prosecutor's Office did not make a deal with Abood. He admitted, however, that he did not think Abood would get a life sentence and, thus, there had to be a reduction in the charges against Abood.[6]

### B. Defense Witnesses

Petitioner presented two witnesses in his defense. Patricia (Trish) Fresard was an assistant prosecutor in Macomb County at the time. She testified that Wissam Abood had been charged with delivery of over 650 grams of cocaine, an offense that carried a life sentence, and that the case was still pending in Macomb County. She also stated that, one to three months after Abood's arrest, she had a meeting with Charles Pappas, Macomb County Prosecutor Carl Marlinga, and two officers involved in the case. The purpose of the meeting was to inform her and Marlinga about what Abood could do in cooperation with the police in Macomb and Oakland Counties. There was an understanding that, if Abood helped law enforcement officers in Oakland County,

---

[6] The most serious charge against Abood carried a mandatory penalty of life imprisonment without the possibility of parole.

8

officials in Macomb County would be informed of Abood's cooperation and testimony. Subsequent to the meeting, Abood was released from jail because of the possibility of what he could do for the police. Fresard denied promising Abood or his attorney a reduction in the charges in exchange for Abood's cooperation, and she claimed that she was not aware of anyone else making such a promise.

The other defense witness was Michael Suhy, the assistant Macomb County prosecutor who handled Wissam Abood's case after Trish Fresard left the drug unit. Suhy testified that Abood's case was scheduled for an entrapment hearing, not trial, and although Abood's attorney informed Suhy that he thought the case was going to be dismissed, Suhy found no agreement to dismiss the case in the prosecutor's file. Suhy admitted that he and Charles Pappas had discussed the likelihood of lowering the charges against Abood based on his cooperation. It was clear to Suhy that the information he was receiving from Oakland County about Abood's cooperation was an attempt to help Abood in having the charges lowered.

## V. DISCUSSION

### A. Failure to Disclose

Petitioner's first claim alleges that the prosecution and Wissam Abood concealed the fact that Abood was granted consideration for his testimony at Petitioner's trial.[7]

_____

[7] Respondent argues that this claim is procedurally defaulted because Petitioner raised it for the first time in his state court motion for relief from judgment. Procedural default is not a jurisdictional bar to review of the merits of an issue, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), *cert. denied*, __ U.S. __, __, 126 S. Ct. 1032 (2006), and the court believes that Petitioner's claim lacks substantive merit. Therefore, in the interest of judicial economy, the court will not analyze whether Petitioner has procedurally defaulted his claim. "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits."

Abood and the assistant Macomb County prosecutors who prosecuted his case testified at Petitioner's trial that no deal was made for Abood's testimony. Abood, however, stated in an affidavit in 1996 that he testified falsely at Petitioner's trial when he said there was no deal with prosecutors.[8] According to Abood, the Macomb County prosecutor and everyone involved with Petitioner's prosecution knew that he had a deal to testify. In fact, after Petitioner's trial, the charges against him were reduced from delivery of more than 650 grams of cocaine to delivery of less than 50 grams, and he received probation instead of imprisonment.

Carl Marlinga, then the Macomb County Prosecutor, stated in a June 14, 2007, affidavit that at a meeting in early 1990 he delegated authority to Charles Papas, Patricia Fresard, and others[9] to approve a charge reduction for Abood (they "were authorized to give Abood reason to believe that, if he delivered, we would deliver.").

## 1. Legal Framework

The Supreme Court has held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87 (1963). "When the 'reliability of a

_____

*Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).

[8] Abood further alleges in his affidavit that his testimony relating to the purchase of narcotics from Petitioner was untrue. He claims that he has never been involved in narcotics transactions with Petitioner.

[9] One of those others mentioned in the Marlinga affidavit was a Sergeant Fred Cleland, who is unknown, and no more than extremely distantly related, to this judge.

given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule," *Giglio v. United States*, 405 U.S. 150, 154 (1972), and "it is ordinarily incumbent on the State to set the record straight." *Banks v. Dretke*, 540 U.S. 668, 676 (2004).

A true *Brady* violation has three components:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The duty to disclose evidence applies even when there has been no request by the accused.  *Id.* at 280 (citing *United States v.* Agurs, 427 U.S. 97, 107 (1976)).  It "encompasses impeachment evidence as well as exculpatory evidence" and evidence "known only to police investigators and not to the prosecutor."  *Id.* at 280-81 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985), and *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* at 434 (quoting *Bagley*, 473 U.S. at 678).  Materiality must be determined by

evaluating the evidence collectively, not item by item.  *Id.* at 436.

## 2.  Application

### a.  Evidence Favorable to the Accused

The first component of the *Brady* test has been satisfied, because evidence that prosecutors made a deal with Wissam Abood in return for his testimony against Petitioner was favorable evidence for Petitioner.  Such evidence would have raised questions about Abood's motive and the truth of his testimony.  It also would have served to impeach Abood's claim that there was no deal for his testimony and that he was testifying out of the goodness of his heart and because of what drugs had done to him and his family.

### b. Suppression by the Prosecution

The second component of the *Brady* test requires the Court to determine whether the State actually suppressed evidence of a deal with Wissam Abood.  In order to assess this factor, it is necessary to review the following sequence of events.

> February 28, 1990 - Wissam Abood was arrested and charged in Macomb County with (1) possession with intent to deliver between 50 and 224 grams of a controlled substance with bond set at $20,000 cash surety, (2) delivery or manufacture of a controlled substance in an amount over 650 grams and conspiracy to commit that offense with bond set at $50,000 cash surety, and (3) delivery or manufacture of less than 50 grams of a controlled substance with bond set at $20,000 cash surety.

> May of 1990 - Abood and his attorney, Sheldon Halpern, met with police officials to discuss Abood's cooperation with law enforcement officials.

> May 7, 1990 - The terms of Abood's bond were modified to require posting only 10% of the bond amount.  In addition, the Macomb County Sheriff was not permitted to keep any of the bond amount as reimbursement for the expenses of housing Abood in jail.

May 10, 1990 - Abood testified against Petitioner before an Oakland Count grand jury.

May 14, 1990 - Mr. Halpren, Abood's attorney, wrote a letter to assistant Macomb County prosecutor Trish Fresard. The letter purports to confirm that Fresard's office has consented to (1) changing the bonds to ten percent, (2) not having any bond money confiscated by the Macomb County Jail, and (3) reducing the most serious charge of delivery and conspiracy to deliver more than 650 grams of cocaine to delivery of over 225 grams with further reductions in the charges depending on the extent of Abood's assistance. The letter asks Ms. Fresard to respond if her understanding of the agreement differed in any manner from what was stated in the letter. The Macomb County Prosecutor's Office did not respond to this letter.

June 14, 1990 - Ms. Fresard apparently called Mr. Halpern's office and stated that it was her understanding that Abood would be cooperating with the government and that his motion on the entrapment issue would not be heard. She asked whether they were ready to plead the case.

July 1990 - Petitioner was charged in Oakland County with conspiracy to possess with intent to deliver over 650 grams of cocaine.

October 14 - 22, 1991 - Petitioner was tried in Oakland County Circuit Court. Wissam Abood, Sergeant Charles Pappas of the Troy Police Department, assistant Macomb County prosecutors Trish Fresard and Mike Suhy denied that Abood was promised anything for his testimony. Pappas acknowledged that Abood received a reduction in bond. Petitioner was convicted as charged and later sentenced to life imprisonment without the possibility of parole.

February 19, 1992 - Mr. Halpern stated in a letter to assistant Oakland County prosecutor Lawrence Bunting that assistant Macomb County prosecutor Michael Suhy "has now consented to reduce the charge" against Mr. Abood and, therefore, Abood's judge could impose an appropriate sentence in the exercise of substantial and compelling considerations. The letter asked Bunting to write to the trial judge in behalf of Abood.

March 17, 1992 - Wissam Abood pleaded guilty in Macomb County Circuit Court to delivery of less than 50 grams of cocaine; all other charges were dropped.

April 30, 1992 - Wissam Abood was sentenced to lifetime probation at the recommendation of Macomb County Prosecutor Carl Marlinga.

August 12, 1996 - Mr. Halpern stated in an affidavit that, after Mr. Abood's preliminary examination in March of 1990, but before his bond reductions on May 7, 1990, Abood agreed to cooperate in the investigation of Petitioner and others. The negotiations with Abood were conducted with the approval of assistant Macomb County prosecutor Trish Fresard. Because the agreement with Abood was not placed on the record, he (Halpern) memorialized the agreement in his letter to Fresard on May 14, 1990. Mr. Abood's case was adjourned numerous times after the agreement so that he could continue to cooperate with the authorities. Although assistant prosecutor Suhy wanted Mr. Abood to get a minimum of five or ten years in prison, Officer Pappas and others working with Abood consistently stated that they did not believe he should be incarcerated because he would be killed in prison as a result of his cooperation. There was little question in his (Halpern's) mind that Mr. Abood genuinely believed when he testified against Petitioner that his own sentence would be substantially reduced from life without parole to five years at worst and probation at best if he continued to cooperate with the authorities.

### i. The Evidentiary Hearing

Petitioner filed his motion for relief from judgment in 1998, and on July 18 and July 21, 2001, the trial court held an evidentiary hearing. Mr. Halpern testified at the evidentiary hearing about his meeting with Macomb County law enforcement officers in May of 1990 and the agreement to reduce Mr. Abood's bond and the charges against Abood if he cooperated. Halpern claimed that, although no one from the Macomb County Prosecutor's Office was present at the meeting, he was assured by Charles Pappas that the Macomb County Prosecutor was "on board." Halpern also claimed that Mr. Abood had told him that assistant Oakland County prosecutor Larry Bunting instructed Abood to testify that he was not given any consideration for his testimony. Halpern knew that was not true.

14

Mr. Halpern admitted on cross-examination that he did not have a formal plea agreement and that he did not withdraw his entrapment motion despite the agreement. He also admitted that his letter to assistant Oakland County prosecutor Larry Bunting on February 19, 1992, in which he stated that assistant Macomb County prosecutor Michael Suhy "has now consented to reduce the charge" appeared to suggest that they agreed to reduce the charge on February 19, 1992. He testified that he should have written, "The prosecution has consented to reduce the charge."

Lieutenant Charles Pappas testified that neither he, nor anyone else entered into a plea agreement with Mr. Abood or Mr. Halpren to reduce the charges and that he did not tell Abood or Halpren that the Macomb County prosecutor was on board. Patricia Fresard testified that she recalled a meeting regarding the cooperation that Abood could provide, but that there was no agreement at the time that the charges would be reduced. She did not recall having seen Halpern's letter dated May 14, 1990, in which Halpern purposed to memorialize their agreement. She also did not recall making the telephone call on June 14, 1990, in which she allegedly stated that Abood would be cooperating with the government and that his entrapment motion would not be heard. She claimed that she had no authority to make an agreement in a case involving more than 650 grams.

Lawrence Bunting, the assistant prosecutor handling Petitioner's trial, testified that he did not make any promises to Abood in return for his testimony and that he did not instruct Abood to say that no promises had been made to him. Instead, he instructed Abood to tell the truth on the stand.

15

Assistant Macomb County Prosecutor Michael Suhy testified that no promises were made to Abood or his attorney and that he had no authority to make such an agreement in a case involving more than 650 grams of cocaine. Although Abood ultimately was permitted to plead guilty to a lesser offense, Suhy claimed that the agreement was not in place at the time of Petitioner's trial. Suhy admitted that there obviously was an understanding that Abood would cooperate and that the only consideration which could be extended on a case involving more than 650 grams of cocaine was a reduction or dismissal of the charges.

James Howarth, who was Petitioner's trial attorney, testified that, on the day before Michael Suhy testified at Petitioner's trial, Suhy told him over the telephone that there was an agreement between the Macomb County Prosecutor's Office and Abood. However, Suhy declined to provide any specific details during their telephone conversation. Howarth conceded that Suhy's actual testimony at Petitioner's trial on the day after their telephone conversation sounded more like an agreement to make an agreement than an actual deal.

### ii. The State Court Opinions

The trial court concluded after the evidentiary hearing that resolution of Petitioner's claim turned exclusively on the factual dispute and that the evidence compelled a finding in Petitioner's favor. In reaching this conclusion, the court gave "great weight" to Sheldon Halpern's letter to Trish Fresard, because the letter was found in the prosecutor's file, it described in detail the consideration that Abood was to receive and did receive, and it was corroborated by the testimony of James Howarth and by

16

Trish Fresard's telephone message to Halpren.  The trial court could not imagine a plausible scenario under which those events could have occurred without Abood having received a reduction in the charges in exchange for his testimony against Petitioner.  The trial court concluded that Petitioner had established a violation of his right to due process.

The Michigan Court of Appeals disagreed.  It was persuaded by the fact that Abood did not sign his plea agreement until after Petitioner's trial.  The court of appeals stated that Abood's discussion with law enforcement officials did not create a valid plea agreement because law enforcement officials have no authority to enter such deals and because the discussion related only to the possibility of future leniency.  The court of appeals concluded that the trial court's finding (that Abood must have had a deal before Petitioner's trial) was clearly erroneous.  The court of appeals also determined that Petitioner had failed to show actual prejudice to his case.

The record indicates that, although there was no formal deal between Wissam Abood or his attorney and Macomb County officials at the time of Petitioner's trial, there was at least an informal agreement to reduce the charges against him in return for his testimony against Petitioner and others.  And because Abood and law enforcement officials denied the existence of a deal, it was unreasonable for the state appellate court to conclude that the prosecutor did not withhold favorable evidence from Petitioner.

### c.  Prejudice

Even assuming that the prosecution withheld evidence regarding consideration given for Wissam Abood's testimony, Petitioner was not prejudiced by the misconduct.  There was evidence from which the jury could have concluded that a deal had been

made with Abood or, at least, that he would be given consideration in the future for his testimony at Petitioner's trial. He was questioned about whether he had made a deal, about his motive for testifying, and about the fact that he could be deported if he were convicted.

In addition, Charles Pappas testified that Abood's bond was reduced and that Abood probably would not be sentenced to life imprisonment. Trish Fresard testified that there was an understanding that, if Abood helped law enforcement officers in Oakland County, officials in Macomb County would be informed of Abood's cooperation and testimony. She believed it was a possibility that, it Abood did everything on the list of possible things to do, it would be considered in his case. Michael Suhy testified that Charles Pappas had informed him about Abood's cooperation in Oakland County and that they had discussed the likelihood of the charges against Abood being lowered due to his cooperation.

Defense counsel argued to the jury that Abood's motive for testifying was to gain favor in Macomb County where he could be sentenced to life imprisonment if convicted of the principal charge against him. Defense counsel also stated that, although the jury could conclude Abood did not have a firm deal as to what was going to happen, the jury also could conclude that Abood was doing everything possible to gain favor in Macomb County and that everybody seemed to know that.

The jury could have concluded from the testimony of Rene Arias and Hassan Haidar, who testified against Petitioner's co-defendant, that it was a common practice for prosecutors to make a deal with drug dealers. Both men testified that they had made a deal for their testimony.

18

Furthermore, there was substantial evidence against Petitioner without Abood's testimony. Rene Arias' testimony alone was sufficient to convict Petitioner. Arias' testimony was corroborated by witnesses who testified about Petitioner's expensive cars and jewelry and his acceptance of $5,000 from Howard Hayes on November 4, 1988, for a drug debt.

There is not a reasonable probability that the result of Petitioner's trial would have been different had evidence of a deal with Abood been disclosed to the jury. Disclosure of the disputed evidence would not have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see also Cone v. Bell*, __ F.3d __, __, No. 99-5279, 2007 WL 1745294, at *10 (6th Cir. June 19, 2007) (" the allegedly withheld evidence . . . does not 'undermine confidence in the verdict because there is [not] a reasonable probability that there would have been a different result had the evidence been disclosed'").

The court rejects Petitioner's claim because he has not satisfied the prejudice prong of the *Brady* test. The state appellate court's conclusion that Petitioner did not suffer actual prejudice from the alleged suppression of evidence did not result in a decision that was contrary to, or an unreasonable application of, *Brady* and related Supreme Court opinions.

### B. Due Process Claims

Petitioner's second claim alleges violations of the constitutional right to due process of law.

### 1. The Prosecutor's Remarks

Petitioner's first due process claim pertains to the prosecutor's comments at trial. Petitioner asserts that the prosecutor's remarks bolstered the testimony of key prosecution witnesses by placing the authority of the prosecutor's office, law enforcement officials, and courts behind the criminal charges. The Michigan Court of Appeals disagreed. It stated that "the prosecutor's comments were responsive, supported by evidence, and did not suggest any special prosecutorial knowledge regarding the veracity of a witness." *Akrawi*, Mich. Ct. App. No. 147344, at 2.

To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's conduct violated a specific constitutional right or infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). It is not enough to show that the prosecutor's conduct or remarks were undesirable or even universally condemned. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "On habeas review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct was 'so egregious as to render the entire trial fundamentally unfair.'" *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)).

Courts must ask first whether the prosecutor's conduct or remarks were improper. *Slagle,* 457 F.3d at 516. If they were improper, the court must consider the following factors to determine whether the improper acts were so flagrant as to warrant reversal:

> (1) whether the evidence against the defendant was strong, (2) whether
> the conduct of the prosecution tended to mislead the jury or prejudice the

defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally.

*Id.* "[S]tate courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Id.* (quoting *Donnelly*, 416 U.S. at 645). Moreover,

> [i]n determining whether prosecutorial misconduct mandates habeas relief, [courts] apply the harmless error standard. *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir. 1997). An error is found to be harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993).

*Bates v. Bell*, 402 F.3d 635, 641 (6th Cir.), *cert. denied*, __ U.S. __, 126 S. Ct. 163 (2005).

### a. The Closing Argument

Petitioner alleges that the prosecutor improperly bolstered the testimony of key prosecution witnesses when he made the following remarks about Rene Arias' plea and sentencing agreement:

> But that isn't something that the prosecutors sat around and agreed upon. We didn't go to a back room and over a cup of coffee and cigarette say well, let's give . . . Rene Arias twelve years for this dope deal if he'll give us Ray Akrawi. <u>That was all taken in front of a federal judge, reviewed by a federal judge and approved by a federal judge</u>.
>
>         . . .
>
> <u>We don't go out and get carte blanche deals with drug dealers, they're approved by judges. They come to you that way.</u>
>
> <u>Do you think that for a moment that these agents would bring Rene Arias in to testify if his testimony wasn't corroborated?</u> Why do you think I put Tim Bethel on the stand to go prove all of that, how they corroborated all of that testimony, to show you that we're not buying a pig in a poke, that's not our business. Our business is to prosecute drug dealers, major drug dealers.

(Tr. Oct. 22, 1991, morning session, at 7-8) (emphasis added by Petitioner).

According to Petitioner, the statement that federal judges approved the deal for accomplice testimony placed the federal court's imprimatur on the reliability of testimony that Petitioner committed the charged offense. Petitioner asserts that the prosecutor's argument undermined the presumption of innocence, shifted the burden of proof, and invaded the province of the jury.

> Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the [prosecutor] behind that witness. *See, e.g., Taylor v. United States,* 985 F.2d 844, 846 (6th Cir. 1993); *United States v. Martinez,* 981 F.2d 867, 871 (6th Cir. 1992). Generally, improper vouching involves either blunt comments, *see, e.g., United States v. Kerr,* 981 F.2d 1050, 1053 (9th Cir. 1992) (stating that improper vouching occurred when prosecutor asserted own belief in witness's credibility through comments including "I think he [the witness] was candid. I think he is honest."), or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony, *see, e.g., [United States v.]Carroll,* 26 F.3d [1380, 1388 (6th Cir. 1994)] (stating that improper vouching occurred when prosecutor argued that the witness testifying under a plea agreement was in jeopardy if the court or government did not find the testimony truthful).

*United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).

The prosecutor did not indicate a personal belief in Rene Arias' credibility or place the prestige of the prosecutor's office behind Arias. However, his remarks did imply that Arias was credible because Arias' testimony was corroborated by a federal agent and Arias' agreement to testify against Petitioner in return for a favorable sentence was approved by a federal judge. Thus, to the extent that the prosecutor vouched for Rene Arias' testimony, the remarks were improper.

The remarks, nevertheless, did not shift the burden of proof and did not amount

to flagrant prosecutorial misconduct. They were made during the prosecutor's closing argument, and the trial court instructed the jurors that the attorneys' arguments were not evidence. (Tr. Oct. 21, 1991, morning session, at 21.) Moreover, the Sixth Circuit has been reluctant to grant habeas relief based on improper prosecutorial statements during closing arguments. *Wilson v. Mitchell*, 250 F.3d 388,399 (6th Cir. 2001). The court finds no merit in Petitioner's claim that the disputed remarks deprived him of due process.

### b. Comment on Drug Forfeiture Laws

The other incident about which Petitioner complains arose when the prosecutor asked Louis Palombella whether one of Petitioner's cars was seized under forfeiture laws. When defense counsel objected, the prosecutor said:

> I didn't ask if the car was forfeited or returned. I said were they seized under the Drug Forfeiture laws.
>
> <u>Police officers, you know, can't just go out and seize somebody's car because they would like to drive the car. They have to have a reason, there has to be a legitimate reason for Mr. Palombella to seize the car</u>.

(Tr. Oct. 18, 1991, at 147) (emphasis added by Petitioner). Petitioner maintains that the prosecutor used judicial authority to substantiate the forfeiture.

The prosecutor, however, was stating the obvious: that law enforcement agents cannot seize cars at whim and that there must be a valid reason for seizing a car. Furthermore, defense counsel stated that he was objecting to the reason the cars were taken, not the actual seizures. Defense counsel's position was that the result of the seizures was hearsay and that there were no court proceedings on the vehicles. The prosecutor made no subsequent mention of forfeiture laws, and any error in mentioning

forfeiture laws was harmless in light of testimony that Petitioner purchased five or six vehicles at a total cost of $244,000 during 1987 and 1988 and was never seen going to a job.

### c.  Conclusion on the Prosecutorial Misconduct Claim

The prosecutor's remarks did not amount to flagrant misconduct and were harmless.  Therefore, the state appellate court's rejection of Petitioner's prosecutorial-misconduct claim was not objectively unreasonable.

### 2.  Evidentiary Issues

Two of Petitioner's due process claims challenge the admission of evidence. Petitioner contends that the trial court erroneously admitted evidence of (1) threats that he made to law enforcement officials during the search of his aunt's home and (2) large sums of money and material possessions.  Petitioner contends that his threatening remark (that, if the police returned, he would meet them with a bullet capable of piercing bullet-proof vests) was inadmissible because it was made during a search that violated his rights under the Fourth Amendment to the Constitution.  He also claims that the remark unfairly portrayed him as a bad and dangerous man, who must be guilty of the substantive charges.  He maintains that the evidence about large sums of money and expensive purchases was irrelevant to the charge.

"Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment."  *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (citing *Estelle v. McGuire*, 502 U.S. 62, 69-70 (1991)).  Furthermore,

24

> [t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. . . .  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.

*Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003).

Because there is no Supreme Court decision holding that the admission of evidence regarding a defendant's other acts violates the Constitution, Petitioner's claim about his threatening remark is not cognizable here.  The state court's decision cannot be deemed "contrary to" Supreme Court precedent under 28 U.S.C. § 2254(d).  *Id.* at 513.  His Fourth Amendment claim likewise is not cognizable on habeas review.  *Stone v. Powell*, 428 U.S. 465, 482 (1976).

Testimony about Petitioner's expensive jewelry and cars was relevant evidence. Petitioner's ability to purchase those items, despite the lack of a job, was some indication that he might be trafficking in narcotics.  The Court concludes that the alleged evidentiary errors were not fundamentally unfair and did not deprive Petitioner of due process.

### 3.  The Trial Court's Conduct

Petitioner contends that the trial court abdicated its responsibility to control the proceedings when it allowed the attorneys to debate the appealability of the jurors' verdict and the forfeiture of Mr. Akrawi's property in the jurors' presence.  Petitioner asserts that the court should have ruled on the issues or given appropriate jury instructions.  The Michigan Court of Appeals stated on review of this claim that there was no manifest injustice in the trial court's failure to issue the instructions *sua sponte*.

25

Petitioner has not supported his claim with any Supreme Court decisions, and the alleged violation of Mich. Comp. Laws § 768.29 (duty of judge to control all proceedings; effect of failure to instruct on applicable law) is not a valid ground for granting habeas relief.  *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A  federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law.").  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam)."  *Estelle v. McGuire,* 502 U.S. 62, 68 (1991).

Furthermore, Petitioner's claim is based on two minor incidents that could not have affected the outcome of his trial.  The first incident occurred during the opening statement given by the co-defendant's attorney.  The attorney stated that there was no appeal from the judges of the facts.  (Tr. Oct. 15, 1991, at 19-20.)  The prosecutor objected to the statement on the ground that appeals are possible following a conviction.

Petitioner asserts that the exchange between the attorneys could have led the jurors to conclude that their verdict was appealable.  The trial court, however, resolved the dispute by stating that "the purpose of the opening statement is only what you intend to prove and I think we ought to limit it to that, what you intend to prove."  (*Id.* at 20.)

The second incident occurred when Petitioner's attorney objected to evidence that Petitioner's cars were seized under drug forfeiture laws.  As previously noted, the prosecutor responded to the objection, saying:

26

I didn't ask if the car was forfeited or returned. I said they were seized under the Drug Forfeiture laws.

Police officers, you know, can't just go out and seize somebody's car because they would like to drive the car. They have to have a reason, there has to be a legitimate reason for Mr. Palombella to seize the car.

(Tr. Oct. 18, 1991, at 147.)

Petitioner's attorney replied that he was not objecting to the seizures. He stated that there was no relevance in why the cars were taken. The prosecutor then stated that he would proceed on a different path, and the trial court said, "You may." (*Id.* at 148). Because the parties resolved the dispute on their own and let it be known that there were no court proceedings on the cars, there was no need for the trial court to make a ruling, particularly since defense counsel stated that he had no objection to evidence of the seizures.

The court recognizes that trial judges must conduct trials "in an orderly way with a view to eliciting the truth and to attaining justice between the parties" and "to see that the issues are not obscured and that the testimony is not misunderstood." *Knapp v. Kinsey*, 232 F.2d 458, 466 (6th Cir. 1956). The alleged omissions in this case did not amount to abdication of the court's responsibility to control the proceedings. The trial court conducted Petitioner's trial in an orderly manner. Although it did not give cautionary instructions following the two instances mentioned above, Petitioner did not request cautionary instructions. In fact, he did not even raise an objection to the opening remarks made by his co-defendant's attorney. He did object to the second instance, but the prosecutor responded appropriately by agreeing not to mention drug forfeiture laws in his future questions.

27

The trial court's alleged omissions did not deprive Petitioner of a fair trial. Therefore, the state appellate court's conclusion that no manifest injustice occurred was reasonable.

## C. The Right to Confront Witnesses

Petitioner's third and final claim alleges that he was denied his right to confront witnesses when special agent Louis Palombella testified that surveillance was performed during the investigatory stage on "several people that were known to [them] through talking to informants, particularly Ragheed Akrawi, Harry Kalasho, and so on." (Tr. Oct. 18, 1991, at 71.) Petitioner did not object to the comment, although counsel for his co-defendant previously objected to the relevance of surveillance and the nature of the overall investigation. The Michigan Court of Appeals treated Petitioner's claim as an allegation of evidentiary error and stated that the trial court did not abuse its discretion in ruling that the contested evidence was admissible, relevant, and more probative than prejudicial.

"The Sixth Amendment guarantees to a criminal defendant the right 'to be confronted with the witnesses against him.' U.S. Const. amend. VI." *Danner v. Motley*, 448 F.3d 372, 377 (6th Cir. 2006). The Amendment applies to state court proceedings, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and it provides a criminal defendant with "the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).

Here, all that was said was that Petitioner and other people were known to federal officials through informants. The informants' actual comments about Petitioner were not repeated, nor offered for the truth of the matter. The agent's comment was

mere background information about the investigation.  Thus, the remark was not

hearsay and did not violate Petitioner's rights under the Confrontation Clause.  As

explained by the Sixth Circuit,

> This exchange at least arguably did not even put before the jury any
> statements made by the CI.  *See United States v. Dunbar,* 104 Fed. Appx.
> 638, 2004 WL 1614932, at *1 (9th Cir. July 19, 2004) (finding no
> Confrontation Clause violation where no testimonial evidence provided by
> CI was ever introduced into evidence); *United States v. Stone,* 222 F.R.D.
> 334, 339 (E.D. Tenn.2004) (same).  Even if testimonial statements of an
> out-of-court declarant were revealed by this testimony, [Petitioner's]
> confrontation right was not implicated because the testimony was provided
> merely by way of background.  *See United States v. Martin,* 897 F.2d
> 1368, 1371-72 (6th Cir.1990) (finding Confrontation Clause not implicated
> where assertions not offered for their content, but merely to explain why
> government commenced investigation).  The Confrontation Clause "does
> not bar the use of testimonial statements for purposes other than
> establishing the truth of the matter asserted." *Crawford* [*v. Washington,*
> 541 U.S. 36, 59 n. 9 (2004)] (citing *Tennessee v. Street,* 471 U.S. 409,
> 414, 105 S. Ct. 2078, 85 L. Ed.2d 425 (1985)).  Any out-of-court
> statements alluded to by [the agent] at this juncture served the purpose of
> explaining how certain events came to pass or why the officers took the
> actions they did.[10]  Because the statements were not offered to establish
> the truth of the matter asserted, the Confrontation Clause does not apply.

*United States v. Cromer*, 389 F.3d 662, 676 (6th Cir. 2004) (footnote in original).

## VI.  CONCLUSION

The state appellate court's rejection of Petitioner's claims was not contrary to, or

an unreasonable application of, Supreme Court precedent.  Accordingly,

IT IS ORDERED that the application for a writ of habeas corpus [Dkt. 1] is

DENIED.

           S/Robert H. Cleland

---

[10]  For the same reason, [the agent's] statements here also did not contain
inadmissible hearsay.

ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  June 30, 2007

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, June 30, 2007, by electronic and/or ordinary mail.


 S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522